**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JAMES WICKENS,** | : | |
| **Plaintiff** | : | **No. 1:19-cv-02021** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **RITE AID HDQTRS CORP.,** | : | |
| **Defendant** | : | |

## MEMORANDUM

This case arises out of the termination of Plaintiff James Wickens ("Plaintiff")'s

employment with Defendant Rite Aid Hdqtrs. Corp. ("Defendant" or "Rite Aid") in January

2018, which Plaintiff alleges was retaliation in violation of Section 806(a) of the Sarbanes-Oxley

Act ("SOX"), 18 U.S.C. § 1514A.  (Doc. No. 1.)  Before the Court is Defendant's motion for

summary judgment.  (Doc. No. 31.)  For the reasons that follow, the Court will grant the motion.

## I.    BACKGROUND[1]

Plaintiff is an attorney who graduated from law school in 1993 and has approximately

two decades of legal experience in private practice and in-house corporate representation.

(SUMF ¶ 1.)  In approximately 2003, Plaintiff accepted a position as Immigration Counsel in

Rite Aid's Human Resources ("HR") Department, which he held until 2010 when he became

"Associate Counsel—Human Resources," also in Rite Aid's HR Department.  (Id. ¶¶ 2-3.)

Plaintiff worked in the HR Department for his entire tenure with Rite Aid, and neither of his

positions required a full Pennsylvania law license.  (Id. ¶ 4.)  As Immigration Counsel, Plaintiff

was responsible for immigration legal assistance, including securing business visas for

---

[1] The following relevant facts of record are taken from Defendant's Statement of Undisputed
Material Facts ("SUMF") (Doc. No. 31-1), and Plaintiff's Response to Statement of Facts
("RSUMF") (Doc. No. 39), and are undisputed unless otherwise noted.

pharmacists and information technology specialists.  (Id. ¶ 5.)[2]  Plaintiff's immigration-related

duties decreased as Rite Aid shifted away from sponsoring new immigration visas and Plaintiff

took on his new role as Associate Counsel.  (Id. ¶ 6.)[3]  As Associate Counsel, Plaintiff continued

to provide immigration support in addition to reviewing and drafting HR policies, collaborating

on employee trainings, performing legal research, and responding to pre-litigation demands.  (Id.

¶ 7.)[4]  Plaintiff also served as the Chair of the HR Compliance Sub-Committee and a HR

Representative for Rite Aid's Policy Oversight Committee.  (Id. ¶ 8.)  At the time of his

termination, five other employees reported to Plaintiff.  (Id. ¶ 10.)[5]  During the course of his

---

[2] Plaintiff clarifies that he was responsible for "the day-to-day direction of up to 3 corporate Paralegals and an International Recruitment Manager.  He also worked closely with Operations and recruiters to recruit, hire, and staff IT professionals and international pharmacists." (RSUMF ¶ 5.)

[3] Plaintiff denies this allegation in part, asserting that Defendant's citation to Plaintiff's deposition testimony "does not support" the assertion that Rite Aid moved away from sponsoring new immigration visas.  (RSUMF ¶ 6.)  However, the Court's review of the portion of Plaintiff's deposition transcript at issue shows that Plaintiff clearly and specifically stated that his immigration duties decreased in 2010 or 2011 because "Rite Aid made a business decision to decrease the amount of sponsoring new visas." (Doc. No. 35, Exh. B at 28.)

[4] Plaintiff clarifies that he was "responsible for the day-to-day direction of Corporate Human Resources Managers" as well as "counsel[ing] and advis[ing] Senior Corporate Human Resource Managers responsible for HR investigations"; "provid[ing] daily legal advice and services to support both human resource and senior business leaders"; "responding to pre-litigation demand letters"; "participating in issues regarding labor unions"; "preparing the annual HR risk assessment"; "overseeing background checks"; "working with pharmacy operations and compliance on licensures and sanctions"; "creating trainings related to workplace discrimination"; "handling of EEOC compliance and state and federal labor, wage, and hours issues"; and "obtaining visas and permanent residency for pharmacists and IT staff." (RSUMF ¶ 7.)

[5] Defendant states these direct reports were non-attorneys.  (SUMF ¶ 10.)  Plaintiff asserts that those individuals were attorneys.  (RSUMF ¶ 10.)  The Court's review of the deposition transcript at issue indicates that Plaintiff testified his direct reports were individuals with law degrees working in non-attorney positions.  (Doc. No. 35, Exh. B at 32-33) (stating that Plaintiff's direct reports "were not working as attorneys for Rite Aid.  They were working as HR managers").

employment, Plaintiff himself reported to Michelle Belsey ("Belsey") (Vice President, Recruitment), then Traci Burch ("Burch") (former Vice President of Labor Relations and Employment Counsel), then, finally, Ken Black ("Black") (former Chief Human Resources Officer), but never Ron Chima ("Chima") (Vice President of Litigation and Commercial Law). (Id. ¶¶ 11-12.)

On October 27, 2015, Rite Aid and Walgreens Boots Alliance ("Walgreens") announced that they entered into a merger agreement (the "Merger Agreement"), under which Walgreens would acquire all outstanding shares in Rite Aid for nine dollars ($9.00) per share.  (Id. ¶ 34.) Approximately a year later, Rite Aid and Walgreens announced that they had agreed to extend the end date of the Merger Agreement to January 27, 2017; however, they ultimately announced an amended merger agreement (the "Amendment"), extending the end date to July 31, 2017 and lowering the price per share from $9.00 to between $6.50 and $7.00.  (Id. ¶¶ 35-36.)  On June 29, 2017, Rite Aid and Walgreens announced the termination of the Merger Agreement and the Amendment, and entered into an asset purchase agreement under which Walgreens would acquire approximately half of Rite Aid's retail locations.  (Id. ¶ 37.)[6]  Rite Aid subsequently worked to transfer its stores to Walgreens.  (Id. ¶ 38.)

Plaintiff alleges that in late February or early March 2017, he was informed that various vice presidents at Rite Aid sold their stock in January 2017 after learning that the Merger Agreement would be extended at a lower per-share sale price.  (Doc. No. 1 ¶ 18.)  Thereafter, Plaintiff believed that those vice presidents "had engaged in conduct in violation of securities laws," namely, insider trading.  (Id.)  Plaintiff alleges that he protested any insider trading to

---

[6] Plaintiff clarifies that the asset purchase agreement provided that Walgreens "would acquire 2,186 stores, related distribution assets, and inventory from Defendant."  (RSUMF ¶ 37.)

Chima and informed Chima that it needed to be investigated.  (Id. ¶ 22.)  Plaintiff also alleges

that he raised the same issue with Burch, Frank Ho ("Ho") (former Vice President of Indirect

Procurement), and Bob Dwulet ("Dwulet") (former Senior Director of Indirect Procurement),

and similarly demanded an investigation.  (Id. ¶¶ 23-25.)  Plaintiff asserts that Burch informed

Black of his allegations of insider training.  (Id. ¶ 24.)  Black, Chima, Ho, and Dwulet testified in

their depositions that they did not recall ever speaking to Plaintiff about any concerns he may

have had about insider trading.  (SUMF ¶ 44.)  Burch testified that she recalled speaking with

Plaintiff about his concerns and that she informed Black that Plaintiff requested an investigation

into insider trading, but noted that she did not inform either Black or Chima that Plaintiff ever

raised any duty or alleged any violation that Rite Aid itself may have committed.  (SUMF ¶ 49;

RSUMF ¶ 49; Doc. No. 35, Exh. F at 74-77.)  At no time during the course of his employment

with Rite Aid did Plaintiff himself conduct any legal research regarding whether Rite Aid's

alleged failure to investigate Plaintiff's allegations of insider trading constituted a crime by Rite

Aid.  (SUMF ¶ 64.)[7]  At no time has Plaintiff identified what specific law he believes Rite Aid

(as opposed to certain individual employees) to have violated.  (Id. ¶ 65.)

 As a result of the asset purchase agreement with Walgreens and subsequent transfer of

Rite Aid retail locations to Walgreens, Rite Aid determined that its "need for the retention of

associates within certain units of the corporate structure" changed, and that, Rite Aid selected

certain associates for termination as part of a top-down reduction in force across multiple

---

[7] Plaintiff states that he "did not need to research what constituted illegal insider trading as he already knew that such conduct violated Rule 10b-5 of the Securities Exchange Act" and that it was his "belief" that if Rite Aid failed to self-report insider trading to the Securities and Exchange Commission ("SEC"), that "may also constitute a crime."  (RSUMF ¶ 64.)  The Court notes that Plaintiff does not dispute that he conducted no research into whether Rite Aid did or did not have a legal obligation to self-report to the SEC.  (Id.)

departments.  (Id. ¶ 74.)[8]  Ultimately, Rite Aid eliminated over eighty (80) positions, and executed a reduction in force that included severance benefit options based on length of service and pay level.  (Id. ¶ 77.)  Black selected Plaintiff for termination.  (Id. ¶ 78.)  Black testified at his deposition that he selected Plaintiff after reviewing "the overall structure of HR and the overall layers of management . . . as well as evaluat[ing] the roles that each held" and "identif[ying] the individuals where the work could either not be done or could be reallocated in some fashion."  (Id. ¶ 79.)[9]  Defendant asserts that Plaintiff's work was "easily reallocated" to outside counsel, as well as various individuals already employed, including Steve Chesney ("Chesney") (former Senior Director of Corporate Human Resources), Mike Atcovitz ("Atcovitz") (former Vice President, Field Human Resources), Chima, and Emily Edmunds ("Edmunds") (Senior Counsel).  (Id. ¶ 80.)[10]

On January 24, 2018, Black and Chima met with Plaintiff and informed him that his employment was being terminated.  (Id. ¶ 81.)  Plaintiff's five direct reports also left Rite Aid in 2018.  (Id. ¶ 82.)  From January 1, 2018 through January 1, 2020, staffing levels in the HR Department declined from eighty-seven (87) employees to sixty-seven (67) employees.  (Id. ¶

---

[8] Plaintiff does not clearly dispute that Rite Aid engaged in a reduction in force; however, Plaintiff disputes that Plaintiff's position was eliminated as part of that reduction in force. (RSUMF ¶ 74.)

[9] As noted, supra, Plaintiff denies that Black selected Plaintiff for termination for the reasons stated by Defendant and further denies that Plaintiff's position was eliminated, but rather asserts that he was replaced.  (RSUMF ¶ 79.)

[10] Plaintiff denies that his immigration work was outsourced entirely to outside counsel and reiterates his belief that he was replaced by Edmunds.  (RSUMF ¶ 80.)

83.)  Rite Aid has not replaced Plaintiff's position of "Associate Counsel—Human Resources." (Id. ¶ 84.)[11]

With regard to Edmunds, Defendant asserts that she was offered the position of Senior Counsel within the Legal Department on November 16, 2017, and that she joined Rite Aid shortly thereafter.  (Id. ¶ 86.)  Edmunds reports to Chima, to whom Plaintiff never reported.  (Id. ¶ 87.)  Defendant asserts that Edmunds' responsibilities are "purely legal, and include managing active litigation" and also that "her role requires a full Pennsylvania law license."  (Id. ¶ 88.)[12] Defendant further notes that Plaintiff has filed various administrative complaints since his termination alleging that he was terminated because of his age or in retaliation for voicing complaints about, inter alia, improper payroll deductions, sexual harassment, race discrimination, and violations of the Americans with Disabilities Act.  (Id. ¶¶ 91, 94.)

On July 31, 2018, Plaintiff submitted his charge of discrimination in violation of SOX with the Occupational Safety and Health Administration ("OSHA").  (Id. ¶ 95.)  OSHA subsequently forwarded Plaintiff's charge of retaliation to the Securities and Exchange Commission ("SEC"), which initiated an investigation into Plaintiff's insider trading allegations. (Id. ¶¶ 97-98.)  As a result of this investigation, the SEC has pursued complaints against two former Rite Aid executives.  (Id. ¶ 106.)  Chima testified at his deposition that, to the best of his knowledge, the SEC did not find that Rite Aid itself engaged in any wrongdoing.  (Id. ¶ 108; Doc. No. 31, Exh. 17 at 37-38.)

---

[11] Plaintiff disputes that Defendant has not replaced his position—he reiterates that he was replaced by Edmunds.  (RSUMF ¶ 84.)

[12] Plaintiff disputes that Edmunds' role is "purely legal" but does not dispute that Edmunds is responsible for managing active litigation, nor does Plaintiff assert that any of his positions involved managing active litigation.  (RSUMF ¶ 88.)

Plaintiff filed a complaint in this Court on November 25, 2019, asserting a single claim against Defendant for retaliatory discharge in violation of SOX.  (Doc. No. 1.)  Specifically, Plaintiff alleges that Defendant retaliated against him for reporting apparent violations of federal securities law.  (Id. ¶ 2.)  Defendant filed the instant motion for summary judgment on January 15, 2021, followed by a brief in support of the motion on January 19, 2021.  (Doc. Nos. 31, 32.)  Having previously been granted an extension of time to file a response (Doc. No. 30), Plaintiff filed his brief in opposition to Defendant's motion (Doc. No. 35) and a Response to Statement of Facts (Doc. No. 34) on February 12, 2021.[13]  Defendant filed a brief in reply on February 26, 2021.  (Doc. No. 37.)  Accordingly, the motion has been fully briefed and is ripe for disposition.

## II.    LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(a).  A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable factfinder to return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  At summary judgment, the inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must

---

[13] Plaintiff's originally filed Response to Statement of Facts (Doc. No. 34) contains redacted portions consistent with the parties' expressed need for confidentiality and request to seal portions of the record (Doc. Nos. 28, 33).  The Court ultimately granted the parties' request to seal portions of the record, finding that the parties made the required showing pursuant to In re Avandia Mktg., Sales Practices & Prods. Liability Litig., 924 F.3d 662 (3d Cir. 2019) regarding the justification for sealing court records (Doc. No. 36), and subsequently ordered Plaintiff to file an unredacted Response to Statement of Facts under seal (Doc. No. 38).  Accordingly, for purposes of this motion, the Court relies on the unredacted, sealed version of Plaintiff's RSUMF. (Doc. No. 39.)

prevail as a matter of law.  See id. at 251-52.  In making this determination, the Court must

"consider all evidence in the light most favorable to the party opposing the motion."  See A.W.

v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

      The moving party has the initial burden of identifying evidence that it believes shows an

absence of a genuine issue of material fact.  See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364

F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of

evidence to support the non-moving party's claims, "the non-moving party must rebut the motion

with facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument."  See Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d

Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party

"fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden at trial," summary judgment is

warranted.  See Celotex, 477 U.S. at 322.  With respect to the sufficiency of the evidence that the

non-moving party must provide, a court should grant a motion for summary judgment when the

non-movant's evidence is merely colorable, conclusory, or speculative.  See Anderson, 477 U.S.

at 249-50.  There must be more than a scintilla of evidence supporting the non-moving party and

more than some metaphysical doubt as to the material facts.  See id. at 252; see also Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Further, a party may not

defeat a motion for summary judgment with evidence that would not be admissible at trial.  See

Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION

### A.    Legal Standard Applicable to SOX Retaliation Claims

Under Section 806 of SOX, a publicly traded company, and any officer, employee, or

other agent of that company, may not:

> discharge, demote, suspend, threaten, harass, or in any other manner discriminate
> against an employee in the terms and conditions of employment because of any
> lawful act done by the employee—
>
> (1) To provide information, cause information to be provided, or
>     otherwise assist in an investigation regarding any conduct which the
>     employee reasonably believes constitutes a violation of section 1341
>     [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities
>     fraud], any rule or regulation of the Securities and Exchange
>     Commission, or any provision of Federal law relating to fraud against
>     shareholders, when the information or assistance is provided to or the
>     investigation is conducted by—
>
>     (A) a Federal regulatory or law enforcement agency;
>
>     (B) any Member of Congress or any committee of Congress; or
>
>     (C) a person with supervisory authority over the employee (or
>         such other person working for the employer who has the
>         authority to investigate, discover, or terminate misconduct).

See 18 U.S.C. § 1514A.  The United States Department of Labor ("DOL") has promulgated

regulations that apply a two-part burden-shifting framework to SOX complaints filed with

OSHA.  See 29 C.F.R. §§ 1980.104(e)(1)-(4); 1980.109(a)-(b).  Federal courts apply the same

framework when reviewing SOX complaints during litigation.  See, e.g., Wiest v. Tyco

Electronics Corp. (Wiest II), 812 F.3d 319, 329 (3d Cir. 2016) (applying DOL's two-part

burden-shifting framework in reviewing a summary judgment record).

At the first step of this framework, the plaintiff bears the burden of establishing a prima

facie case of retaliation under SOX.  See 29 C.F.R. § 1980.104(e)(1)-(2).  To this end, the

plaintiff-employee must show that: (1) he engaged in a protected activity; (2) the defendant knew

9

or suspected that he engaged in the protected activity; (3) he suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action.  See id.; see also Wiest II, 812 F.3d at 329.   An employee's activity is "protected" where the employee believes "that the conduct that is the subject of his communication relates to an existing or prospective violation of one of the federal laws referenced in [Section] 806."  See Reilly v. GlaxoSmithKline, LLC, 820 F. App'x 93, 96 (3d Cir. 2020) (citing Wiest v. Lynch (Wiest I), 710 F.3d 121, 134 (3d Cir. 2013)).  The employee's belief must be both subjectively in good faith and objectively reasonable.  See Wiest I, 710 F.3d at 134.  "A belief is objectively reasonable when a reasonable person with the same training and experience as the employee would believe that the conduct implicated in the employee's communication could rise to the level of a violation of one of the enumerated provisions in Section 806."  Id. at 132.

With respect to the fourth element, a contributing factor is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision."  See Wiest II, 812 F.3d at 330 (collecting cases).  A plaintiff may satisfy this element with either direct or circumstantial evidence, including temporal proximity between the protected activity and the adverse action.  See id. (citing Feldman v. Law Enforcement Assocs. Corp., 752 F.3d 339, 348 (4th Cir. 2014)).  A causal connection may nonetheless be severed by the passage of a significant period of time or another intervening event.  See id.

To withstand a motion for summary judgment, a plaintiff must identify evidence in the record to support all four elements of a prima facie case of retaliation under SOX.  Once a plaintiff does so, the burden shifts to the employer to demonstrate by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity.  See 29 C.F.R. § 1980.109(b) (directing that "relief may not be ordered if the

[defendant] demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity").  When reviewing a motion for summary judgment, a court should find in favor of the defendant where "there is no genuine issue of material fact casting doubt on [the defendant's] affirmative defense."  See Wiest II, 812 F.3d at 333.

### B.    Arguments of the Parties

In arguing that it is entitled to summary judgment on Plaintiff's retaliation claim, Defendant argues initially that Plaintiff  has failed to establish a prima facie case of retaliation because "[Plaintiff] did not engage in SOX-protected activity and his termination was not caused by such alleged activity."  (Doc. No. 32 at 14.)  As to the first element of the prima facie case— whether Plaintiff engaged in protected activity—Defendant argues, inter alia, that: (1) Plaintiff did not subjectively believe that Rite Aid—as opposed to individual executives who committed insider trading—committed fraud (id. at 16); and (2) even if Plaintiff believed Rite Aid committed fraud, such a belief was not objectively reasonable for an individual with Plaintiff's "decades of legal experience" (id. at 21).

More specifically, Defendant argues that none of Plaintiff's alleged concerns rise to the level of protected activity "because the record reflects that he did not possess a subjective or objectively reasonable belief that Rite Aid violated any law enumerated by SOX or otherwise committed fraud."  (Id. at 16.)  Defendant notes that Plaintiff alleges he engaged in protected activity by "reporting apparent violations of federal securities law" and "demanding that Rite Aid investigate his belief that certain vice presidents traded their [Rite Aid] stock on inside information that the Merger Agreement would be extended at a lower agreed-upon share sales price."  (Id. at 16-17.)  Defendant argues that, "at the same time that Plaintiff alleges he engaged

in SOX-protected activity, he took deliberate steps to commence a completely separate

investigation," but at no time did Plaintiff "draft a single email, note, or statement regarding what

he now alleges are serious securities laws violations."  (Id. at 17.)  Defendant further asserts that:

> Plaintiff vaguely claims he "protested" that Rite Aid vice presidents had
> committed insider trading and demanded an investigation.  But these conclusory
> allegations are devoid of any reference to fraudulent acts committed by Rite Aid.
> In fact, at no point in time did Plaintiff have an "actual" belief that [Rite Aid] had
> committed a crime: not in March 2017 when he allegedly learned of the purported
> insider trading, not during the remainder of his Rite Aid employment, and not
> years later when he sat for his deposition.

(Id. at 19-20) (emphasis in original).  Accordingly, Defendant argues that "[g]iven that Plaintiff

failed . . . to raise any concerns of fraud, let alone Rite Aid committing fraud, no reasonable jury

would find that Plaintiff meets the subjective belief requirement under SOX."  (Id. at 21)

(emphasis in original).

Defendant similarly asserts that "Plaintiff cannot proffer any competent evidence

demonstrating that a reasonable person with his decades of legal experience would believe that

Rite Aid engaged in any conduct that 'relate[s]' in an understandable way to one of the stated

provisions of Section 806."  (Id. at 21.)  Defendants rely on Harkness v. C-Bass Diamond, LLC,

No. 08-CV-231, 2010 WL 997101, at *2, *5-6 (D. Md. Mar. 16, 2010), in which the district

court found that the attorney-plaintiff, who worked as general counsel for the defendant-

company, did not have an objectively reasonable belief that the company violated a securities

regulation because, given her experience and available resources, she should have known that no

violation occurred.  (Id. at 22) (citing Harkness, 2010 WL 997101, at *7).

Defendants further rely on Mann v. Fifth Third Bank, No. 09-CV-14/09-CV-476, 2011

WL 1575537, at *10-11 (S.D. Oh. Apr. 25, 2011), in which the district court found that a belief

that the defendant-company was committing shareholder fraud was not objectively reasonable

because the appropriate regulators did not appear to consider them violations.  (Id. at 22-23)

(citing Mann, 2011 WL 1575537, at *11).  To this end, Defendant argues that "while Plaintiff

possessed the skills to investigate" his concerns, he "did not research whether Rite Aid would

violate securities law by not investigating his claims.  Indeed, he admitted that he only looked at

the securities laws that might be implicated after he was terminated by [Rite Aid]."  (Id. at 23)

(emphasis in original).  Moreover, Defendant notes that the SEC itself has filed complaints

against two former Rite Aid executives, but has never alleged any wrongdoing on the part of Rite

Aid and asserts that "[t]he fact that the SEC has taken no action against [Rite Aid] plainly

'militates against finding [Plaintiff's] belief objectively reasonable.'"  (Id. at 25-26) (quoting

Mann, 2011 WL 1575537, at *11).

　　　　As to the fourth element—whether any alleged protected activity was a contributing

factor in his termination—Defendant asserts that Plaintiff's termination was the result of a broad

reduction in force and notes that "[Plaintiff] has not proffered a single piece of evidence to

suggest that he was singled out for termination" and that "Plaintiff has failed to establish that the

decision maker relative to his employment knew of and acted based on Plaintiff's alleged

protected activity."  (Id. at 28-29.)  More specifically, Defendant argues that "[t]he ultimate

decision to select Plaintiff for termination was made by Mr. Black, whom Plaintiff admitted he

never spoke to about his alleged insider trading concerns" and who testified that "Plaintiff was

selected for elimination after considering the [HR] Department as a whole and determining

whose responsibilities could be eliminated or reallocated."  (Id. at 29.)  Defendant asserts that

"Plaintiff has proffered little evidence that Mr. Black knew of Plaintiff's alleged protected

activity, and no evidence that Mr. Black terminated Plaintiff because of his alleged activity."

(Id. at 30) (emphasis in original).

Regarding Plaintiff's allegation that he was replaced by Edmunds, Defendant asserts that "the evidence demonstrates Ms. Edmunds did not replace Plaintiff." (Id. at 30.) Defendant notes that:

> Ms. Edmunds, who was hired weeks before Plaintiff's separation[,] is Senior Counsel (not Associate Counsel like Plaintiff), works in Rite Aid's Legal Department (a Department wholly distinct from Plaintiff's former Department (HR)), and is supervised by Ron Chima, whom Plaintiff admitted never supervised him. Ms. Edmunds' job is purely legal, includes managing litigation, and specifically requires a full Pennsylvania law license.

(Id. at 30-31.) Defendant contrasts Edmunds' role with Plaintiff's, which "did not require a Pennsylvania law license" and "included non-legal responsibilities, including the policy work described above and overseeing non-attorneys, and did not include the legal work performed by Ms. Edmunds, including active litigation." (Id. at 31.) Finally, Defendant notes that "multiple witnesses testified that Plaintiff's responsibilities were divided among outside counsel and several Rite Aid employees, not simply shifted to Mr. Edmunds' plate" and that "[t]hese facts alone make plain Ms. Edmunds did not replace Plaintiff." (Id. at 31-32.)

In the alternative, Defendant argues that, even if the Court finds that Plaintiff has established a prima facie case of retaliation, it has proffered sufficient evidence to establish that it would have terminated Plaintiff's employment as part of its reduction in force regardless of any alleged protected activity. (Id. at 32-33.) To this end, Defendant asserts that "[a]lthough Plaintiff may disagree with his separation from [Rite Aid], Rite Aid terminated his employment for legitimate business reasons" and that "[Plaintiff's] subjective beliefs do not change the fact that [Rite Aid] sold approximately half of its retail locations and needed to reorganize from the top down." (Id. at 32.) Defendant notes that "Plaintiff was one of dozens of employees who separated from [Rite Aid] as a result of that reduction in force"; that "certain of Plaintiff's

responsibilities (immigration law) has been diminished for years"; and that "Plaintiff's entire team of direct reports likewise separated from Rite Aid." (Id.)

Plaintiff argues in opposition that: (1) he engaged in protected activity that was both subjectively and objectively reasonable (Doc. No. 35 at 17-29); (2) Defendant knew he engaged in protected activity (id. at 29-30); (3) his protected activity was a contributing factor in Defendant's decision to terminate his employment (id. at 30-36); and (4) Defendant has failed to demonstrate by clear and convincing evidence that it would have terminated Plaintiff's employment regardless of any protected activity (id. at 36-39). More specifically, Plaintiff argues that he "engaged in protected activity when he reported illegal insider trading of Defendant's stock, demanded that Defendant investigate the insider trading, and demanded that Defendant self-report the insider trading to the SEC." (Id. at 17-18.) With respect to Plaintiff's subjective and objective reasonableness, Plaintiff asserts that he had an understanding that insider trading "constituted violations of federal securities laws" and that he told his supervisor, Burch, that "Defendant's failure to investigate constitutes a violation of securities laws" and "demanded to Burch that Defendant self-report the insider trading [to the SEC]." (Id. at 22.) Plaintiff further argues that "[a] reasonable person in Plaintiff's position would have believed as he did, that [a vice president's] conduct and Defendant's failures to act, constituted violations of federal securities laws." (Id. at 25.) Plaintiff notes that he "never practiced nor had a specialty in the area of securities law" and, therefore, argues that he "had no obligation to conduct an independent investigation into . . . whether Defendant's failure to investigate and self-report the insider trading constituted violations of securities laws." (Id.)

With respect to Plaintiff's second and third arguments—that Defendant knew that Plaintiff engaged in protected activity and that Plaintiff has established his protected activity was

a contributing factor in his termination—Plaintiff first argues that Burch testified that "shortly after Plaintiff made a report of illegal insider trading and demanded that Defendant investigate and self-report to government authorities, she reported the same to Black." (Id. at 29.)[14]  Next, Plaintiff argues that:

> [t]he fact that the record contains evidence that Black, the individual responsible for Plaintiff's termination, knew of the protected activity, is, in itself, sufficient evidence for a jury to conclude that Plaintiff's report was a contributing factor in Defendant's decision to terminate his employment.

(Id. at 32.)  Plaintiff further asserts that Defendant "began to exclude him from monthly HR meetings with field directors," "barred him from conducting HR trainings," and "denied his requests for information," and that Black instructed Plaintiff not to complete "the Annual HR Risk Assessment" until March 2018.  (Id. at 33-34.)

Finally, Plaintiff argues that Defendant has failed to demonstrate that it would have terminated his employment regardless of any protected activity.  As noted previously, Plaintiff argues that "a majority of Plaintiff's job duties were not eliminated as a result of Defendant's alleged reduction in force, but were rather reassigned to Emily Edmunds." (Id. at 37.)  Plaintiff also asserts that Defendant hired Edmunds in a "suspect manner" and "never gave Plaintiff notice of the vacant position." (Id. at 39.)  Accordingly, Plaintiff argues that Defendant's affirmative defense has not been proven by clear and convincing evidence.  (Id.)

---

[14] The Court notes that Plaintiff mischaracterizes Burch's testimony on this point.  The section of Burch's deposition that Plaintiff cites in support of this argument only indicates that Burch reported that Plaintiff requested an internal investigation.  (Doc. No. 35, Exh. F at 45.)  Burch does not state she reported anything related to Defendant self-reporting to the SEC.  Indeed, elsewhere in her deposition, she specifically stated that "I don't recall that I had that conversation with [Black]." (Id. at 76.)  She also responded, when asked if she informed Chima of any allegation that Rite Aid was required to self-report, "I don't think I said it like that." (Id. at 77.)

**C.**     **Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claims**

As an initial matter, the Court need not resolve the question of whether Plaintiff has adequately established a <u>prima facie</u> case of SOX retaliation, because even assuming that he has, upon review of the briefs of the parties and the evidence of record, and construing all facts in the light most favorable to Plaintiff as the non-moving party, the Court concludes that Defendant has demonstrated by clear and convincing evidence that it would have terminated Plaintiff in the absence of any protected activity as part of its reduction in force measures. <u>See</u> 29 C.F.R. § 1980.109(b) (stating that relief "may not be ordered if the [defendant] demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity"). As noted, <u>supra</u>, Plaintiff's only argument in opposition to Defendant's affirmative defense is that his position was not eliminated, but rather, that he was replaced by Emily Edmunds. (Doc. No. 35 at 36-39.) This argument is unavailing.

First, the record evidence clearly establishes that Defendant did, in fact, undertake a reduction in force following the failed merger with Walgreens, ultimately eliminating over eighty (80) positions. (SUMF ¶¶ 74, 77.) Indeed, Plaintiff does not identify any evidence that would dispute this; rather, Plaintiff disputes whether his specific termination was the result of this reduction in force. (RSUMF ¶¶ 74, 79.) However, Plaintiff also does not identify any evidence that would dispute the testimony of record that Black made the determination to eliminate Plaintiff's position after "look[ing] at the overall structure of HR and the overall layers of management" and "identif[ying] the individuals where the work could either be not done or could be reallocated in some fashion."[15] (Doc. No. 35, Exh. H at 84-85.) Nor does Plaintiff

---

[15] Plaintiff argues that "Black testified that he was unsure whether he reviewed a copy of Plaintiff's job description when evaluating whether to terminate Plaintiff" (RSUMF ¶ 79); however, the Court notes that Black also testified that he had an understanding of what Plaintiff's

identify any evidence to dispute the fact that Plaintiff's former department—Defendant's corporate HR Department—dropped from eighty-seven (87) employees to sixty-seven (67) employees between January 1, 2018 and January 1, 2020.[16]  (SUMF ¶ 83; RSUMF ¶ 83.) Plaintiff's own subjective beliefs are insufficient to create a genuine dispute of material fact when unsupported by any other record evidence.  See Anderson, 477 U.S. at 249-50 (noting that a motion for summary judgment should be granted where the non-movant's evidence is colorable, conclusory, or speculative).

Next, the Court finds that the record evidence demonstrates that Plaintiff's position of "Associate Counsel—Human Resources" was eliminated and that Edmunds did not replace Plaintiff.  Although some of Plaintiff's duties were reallocated to Edmunds, Plaintiff's duties were also reallocated to several other individuals, including Chima and outside counsel.  (Doc. No. 35, Exh. D at 36-37.)  Plaintiff identifies no evidence suggesting that he was ever responsible for the majority of duties that Edmunds currently handles.[17]  Further, Plaintiff

---

job duties were at the time and that his response was consistent with Plaintiff's own description of his job duties (Doc. No. 35, Exh. B at 26-27; Exh. H at 84).  The Court further notes that Black was acting as Plaintiff's direct supervisor at the time.  (Id., Exh. H at 85.)  Accordingly, the Court does not find that this limited argument suffices to create a genuine dispute of material fact regarding Black's decision to eliminate Plaintiff's position.

[16] Although Plaintiff denies generally that Defendant's HR Department "has continued to shed layers," Plaintiff identifies no evidence to the contrary.  (RSUMF ¶ 83.)

[17] Although Plaintiff asserts generally that "Plaintiff performed the majority of [Edmunds'] same duties at the time of his termination" (Doc. No. 35 at 38), Plaintiff's testimony and resume indicate he was responsible for primarily policy review, the annual HR risk assessment, compliance training, business immigration matters, and responding to pre-litigation demand letters (Doc. No. 31, Exh. 1; Doc. No. 35, Exh. B at 26-27).  Plaintiff has never suggested he was ever responsible for active litigation management.  Plaintiff's own evidence regarding Edmunds' job responsibilities does not dispute, and indeed, conforms with Defendant's assertion that Edmunds is primarily responsible for managing active litigation, although she, Chima, and another associate in the legal department collectively assumed responsibility for the pre-litigation demand process following Plaintiff's termination.  (SUMF ¶ 88; Doc. No. 31, Exh. 1; Doc. No.

identifies no authority to support the notion that an individual's position is not properly deemed eliminated during a reduction in force merely because job duties are reallocated to other current employees.[18]   The Court, however, notes that the Third Circuit regularly affirms decisions granting summary judgment in favor of employers where current employees have assumed the job duties of an employee terminated as part of a reduction in force.  See, e.g., Tirk v. Dubrook, Inc., 673 F. App'x 238, 243 (3d Cir. 2016) (stating that "no reasonable jury could infer that Dubrook actually fired Tirk for any reason other than the company's economic circumstances and the fact that other employees could perform the responsibilities of Tirk's former position along with their own job responsibilities"); Muhammad v. Sills Cummis & Gross P.C., 621 F. App'x 96, 100 (3d Cir 2015) (finding the argument that the defendant "did not save money when it assigned [the plaintiff's] duties to two other Operations employees because those employees earn more money than he did" unpersuasive because it assumed "that the employees had no other duties than those which previously belonged to [the plaintiff]"); Stacy v. LSI Corp., 544 F. App'x 93, 97 (3d Cir. 2013) (noting that the plaintiff "argue[d] only that another current employee assumed her responsibilities" and finding "that action to be consistent with Defendants' reduction-in-force argument") (emphasis in original).  The Court also finds persuasive the reasoning of the United States District Court for the Eastern District of

---

35, Exh. D at 36-37; Exh I; Exh. J.)  Plaintiff also identifies no evidence that suggests Edmunds is responsible for the policy review and HR training work for which Plaintiff was formerly responsible.

[18] Plaintiff cites Martinez v. UPMC Susquehanna, 986 F.3d 261 at 267 (3d. Cir. 2021), for the idea that "not all duties have to go to a single replacement; the replacement's job does not have to match the plaintiff's job exactly" (Doc. No. 35 at 37); however, Martinez was a review of a motion to dismiss a discrimination complaint, not a motion for summary judgment.  Indeed, the Third Circuit noted in the next line that "[t]he court at summary judgment . . . can decide whether the age differences give rise to an inference of discrimination and whether the alleged replacements are relevant comparators."  See Martinez, 986 F.3d at 267.

Pennsylvania in <u>Millard v. Corestates Financial Corp.</u>, No. 98-CV-5028, 2001 WL 1175135, at *2-3 (E.D. Pa. July 30, 2001), in which the plaintiff similarly argued that he was "replaced" after a reduction in force because two existing employees assumed the majority of the plaintiff's duties following his termination.  The <u>Millard</u> court determined that such allegations do not equate to "replacement" for the purpose of establishing a <u>prima facie</u> case of discrimination because, "[i]n all cases where a position is eliminated, existing duties are assumed by other employees" and noted that "[i]f the Court were to hold otherwise, all reduction-in-force cases would become typical termination cases, and there would be no need for a differing analysis to distinguish between the two types of cases."  <u>See Millard</u>, 2001 WL 1175135, at *2-3.

In sum, Defendant has proffered numerous pieces of evidence that: (1) it engaged in a reduction of force related to the sale of over two thousand (2,000) of its retail locations; (2) it eliminated over 80 positions, including Plaintiff's; and (3) Plaintiff's work was easily reallocated to remaining employees.  (SUMF ¶¶ 73-84.)  Plaintiff has not disputed that a reduction in force occurred, only that his termination was the result of any reduction in force.  (RSUMF ¶ 74.)  However, Plaintiff has failed to identify any record evidence beyond his own testimony and subjective beliefs in support of his position.  Further, Plaintiff cites no authority for the proposition that his position was not eliminated or that he was "replaced" by Edmunds, who was already an employee at the time of Plaintiff's termination and had her own distinct responsibilities, merely because his job duties were divided among her and multiple other individuals.  Accordingly, the Court finds that Plaintiff has failed to establish any genuine dispute of material fact with respect to Defendant's affirmative defense and will grant Defendant's motion for summary judgment.

**IV.    CONCLUSION**

For all of the foregoing reasons, the Court will grant Defendant's motion.  An appropriate

Order follows.